# Exhibit A

**EXHIBIT A**
**AFFIDAVIT OF SPECIAL AGENT RYAN P. GLYNN**

I, Ryan P. Glynn, depose and state the following:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent assigned to the Drug Enforcement Administration ("DEA"), New England Field Division Financial Investigation Team ("NEFD-FIT"). I have been employed as a Special Agent with the DEA since 2015 and have been assigned to NEFD-FIT since April 2021.

2. As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I have received significant training in the field of narcotic investigations and enforcement. Through my training and experience, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by people engaged in the trafficking of illegal drugs.

3. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds. Through my training and experience, I have become familiar with the manner in which narcotics traffickers collect, expect, account for, transport and launder drugs proceeds.

4.      Based on my training and experience, I am also aware that drug traffickers and money launderers commonly use cellular telephones to communicate about and further their drug trafficking and money laundering activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance.  I am also aware that drug traffickers and money launderers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

## PURPOSE OF AFFIDAVIT

5.      I submit this affidavit in support of a Verified Complaint for Forfeiture *in Rem* against the following assets:

   a. $102,120 in United States currency, seized on December 15, 2022, currently being held in the District of Massachusetts (the "Defendant Property").

6.      As set forth below, there is probable cause to believe that the Defendant Property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it represents moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.

7.      This affidavit is based on my personal knowledge, information provided by other law enforcement officers and government employees, and information gathered during this investigation including physical surveillance, telephone records, interviews of witnesses, the utilization of a DEA Confidential Source ("CS"), and a review of documents.  This affidavit is not

intended to set forth all the information that I have learned during this investigation but includes only the information necessary to establish probable cause for the forfeiture of the Defendant Property.

## PROCEDURAL HISTORY

8. DEA seized the Defendant Property and commenced administrative forfeiture proceedings. On or about August 14, 2023, DEA received a claim for the Defendant Property from Tito Ramirez ("Ramirez"), through his attorney William Keefe. No other claims were submitted. The United States filed two assented-to motions to extend the time to file a civil complaint against the Defendant Property. The United States filed a final assented-to motion to extend the time to file a civil complaint against the Defendant Property until March 11, 2024 to prepare and file a civil forfeiture complaint. This motion was granted by the District Court. *See* M.B.D. No. 23-MC-91589-IT (Doc. No. 10).

## PROBABLE CAUSE

9. As set forth below, there is probable cause to believe that the Defendant Property constitutes moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical, or proceeds traceable to such an exchange, or moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of 21 U.S.C. §§ 841 and/or 846. Accordingly, there is probable cause to believe the Defendant Property is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

### *The October 26th Money Pickup*

10. On October 26, 2022, members of the NEFD-FIT assisted in an undercover money pickup at a location on Centre Street in Boston, MA (the "October Money Pickup").

11. During the operation, NEFD-FIT identified Ramirez as the courier who delivered the drugs proceeds to the undercover task force officer (the "UC") on October 26, 2022. Ramirez's vehicle, a white Toyota Corolla (the "Corolla") bearing Massachusetts license plate number 2TNW67, and his residence, were also identified during the October Money Pickup.

12. Prior to the October Money Pickup, law enforcement requested an undercover telephone number and a dollar bill serial number in order to make arrangements for the money pickup. The UC also provided a verbal code. On October 21, 2022, the UC received a text message indicating the dollar bill serial number and a date of October 23, 2022 at 5:00 p.m. The UC placed a couple of phone calls to the phone number that sent the text message, which were not answered. The UC received a text message from the phone number stating, "we talk on Sunday." NEFD-FIT later identified the user of this phone number as Ramirez.

13. On October 24, 2022, the UC sent a text message to Ramirez asking Ramirez to call him. He also placed a call to Ramirez, which Ramirez did not answer. The UC received a text message from Ramirez indicating that Ramirez did not like to talk on the phone and preferred to communicate via text message. The UC asked Ramirez if he was texting the UC regarding the Boston, MA pick-up and Ramirez stated "yes." The UC asked Ramirez how many miles the car had (referring to the U.S. currency) and Ramirez stated "180" (referring to $180,000 in U.S. currency). The UC asked Ramirez if he was located in the Boston, MA area and Ramirez stated that he was. The UC told Ramirez that he would be available to conduct the pick-up on Wednesday afternoon (October 26, 2022). The UC received a text message from Ramirez stating "ok, perfect." The UC and Ramirez agreed to discuss the pending pick-up on Wednesday in order to finalize arrangements.

14. On October 26, 2022, the UC sent Ramirez a text message asking Ramirez if he was available so the UC could pick-up the car (referring to the U.S. currency). After further text

4

messages, the UC and Ramirez made arrangements to conduct the pick-up that afternoon in the vicinity of 697 Centre St, Boston, MA at about 3:00 p.m.

15. At approximately 2:40 p.m. the UC received a text message from Ramirez indicating that he had arrived at the location and that he was in a white Toyota Corolla. The UC told Ramirez that he (the UC) would exit his vehicle so he could locate Ramirez. The UC exited his undercover vehicle and made eye contact with Ramirez who was in the Corolla. The UC approached the Corolla, entered the vehicle, sat in the front passenger seat and greeted Ramirez.

16. The UC asked Ramirez if he was the person texting the UC regarding the pending pick-up. Ramirez stated that he was and confirmed his (Ramirez's) cell phone number as the number that had been texting the UC.

17. Ramirez asked the UC for the dollar bill serial number and the UC showed Ramirez a picture of the dollar bill serial number, which Ramirez confirmed. Ramirez kept the dollar bill as a receipt.

18. The UC observed a large bag with red handles containing a brown box on the floor of the front passenger seat. The UC opened the brown box and observed several bundles of U.S. currency wrapped in green plastic. The UC asked Ramirez how much the amount was, and Ramirez stated "180" (referring to $180,000.00 U.S. currency). The UC asked Ramirez how the money was "packaged" (referring to the money being properly organized). Ramirez stated that the bundles consisted of "20" each (referring to $20,000.00 U.S. currency) and was well counted.

19. The UC stated that he (the UC) had associates that were looking for a good price for "perico" (referring to cocaine) and "synthetic" (referring to fentanyl). The UC asked Ramirez if they worked with "perico" and Ramirez stated "yes." The UC asked Ramirez how much a gallon (referring to kilogram) of "perico" was going for. Ramirez stated that the price varied. The UC asked Ramirez if they worked with "synthetic." Ramirez stated that they did and told the UC to

5

be careful with the rainbow-colored pills (synthetic) that looked similar to candy. The UC asked Ramirez how much a "synthetic" pill was going for and Ramirez stated that the price also varied.

20. The UC asked Ramirez if he would have more money pick-ups in the near future. Ramirez stated that he would, but that his (Ramirez's) associate would inform the UC on other pick-ups. After the pick-up, another task force officer showed the UC a photograph of a Massachusetts driver's license that belonged to Ramirez and the UC positively identified Ramirez as the person that met with the UC and delivered the currency.

### *The December 15th Money Pickup*

21. On December 12, 2022, NEFD-FIT agents assisted in another money pickup in Boston, MA. A NEFD-FIT undercover agent communicated via text message with an unknown courier later determined to be Ramirez and agreed to meet Ramirez at the same location that had been used in October for a second money pickup that was to occur on December 15, 2022 (the "December Money Pickup").

22. Prior to the December Money Pickup, law enforcement requested an undercover telephone number and a dollar bill serial number in order to make arrangements for the money pickup. The UC provided his undercover telephone number, a dollar bill serial number, and also provided a verbal code. On December 13, 2022, the UC received a text message indicating the dollar bill serial number the UC had provided, a date of Thursday (December 15, 2022) and the verbal code the UC had provided. The UC placed a phone call to the phone number that had sent the text, which was not answered. The UC immediately received a text message stating "text me, I don't talk on the phone, for Thursday." NEFD-FIT later identified the user of the phone number as Ramirez.

23. The UC asked Ramirez if he was texting the UC regarding the Boston, MA pick-up and Ramirez stated "yes." The UC asked Ramirez how much the amount was. Ramirez stated

"126" (referring to $126,000.00 U.S. currency) and that he preferred to conduct the pick-up at 5:00 p.m. After further text messages, the UC and Ramirez agreed to discuss the pending pick-up on Thursday (December 15, 2022) in order to finalize arrangements.

24. In the morning on December 15, 2022, the UC sent Ramirez a text message asking Ramirez if he was available to conduct the pick-up earlier that day. After further text messages, the UC and Ramirez arranged the pick-up for that afternoon in the vicinity of 697 Centre St., Boston, MA at about 2:00 p.m.

25. A few minutes before 2:00 p.m., the UC sent Ramirez a text message indicating that he (the UC) would be arriving in the area of the meet location in about 15 minutes. Ramirez told the UC to park at the meet location and that Ramirez would be there in about 40 minutes. The UC sent Ramirez a text message stating ok.

26. Earlier in the day on December 15, 2022, NEFD-FIT agents, members of the Boston Police Department ("BPD"), and members of the Massachusetts State Police ("MSP") established surveillance of Ramirez's residence. Shortly before the coordinated money pickup was to occur, agents observed Ramirez exit his residence with a weighted bag and watched as he placed the bag into his vehicle—the white Toyota Corolla—and then left the area.

27. A short time later, BPD officers stopped the Corolla on Seaver Street in Boston, MA for a traffic violation. The BPD officers identified the driver and sole occupant as Ramirez. During the stop, BPD officers located the bag, which they had seen Ramirez carry from his residence, and discovered that it contained a total of $102,120 in bulk United States currency— the Defendant Property. There was also a roll of green cellophane with the money. After conducting a pat-down of Ramirez, a BDP officer discovered three cell phones. A NEFD-FIT agent at the stop observed three unread messages from the UC on one of the phones. NEFD-FIT agents then interviewed Ramirez, who gave inconsistent statements about the money. The

Defendant Property was seized by NEFD-FIT agents. Ramirez was given a DEA-12 receipt documenting the seizure of the Defendant Property. The Defendant Property was processed in accordance with DEA guidelines.

## CONCLUSION

28.   Based on the information set forth above, I believe there is probable cause that the Defendant Property constitutes moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical, or proceeds traceable to such an exchange, or moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of 21 U.S.C. §§ 841 and/or 846. Accordingly, the Defendant Property is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

Pursuant to 28 U.S.C. § 1746, I declare under the penalties of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this  1st  day of March 2024.

*Ryan Glynn*
_____
Ryan P. Glynn
Special Agent
Drug Enforcement Administration